UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF MISSISSIPPI
JACKSON DIVISION

AUSTIN FIREFIGHTERS RELIEF AND
RETIREMENT FUND                                          PLAINTIFF

VS.                              CIVIL ACTION NO. 3:07CV228TSL-JCS

WILLIAM A. BROWN, BROWN
BOTTLING GROUP, INC., RAYMOND
WILKINS AND MIKE COTTINGHAM                              DEFENDANTS

MEMORANDUM OPINION AND ORDER

Plaintiff/counter-defendant Austin Firefighters Relief and
Retirement Fund has moved for partial summary judgment against
William A. Brown and Brown Bottling Group, Inc. on these
defendants' rescission defenses and their rescission and
declaratory judgment claims as set forth in their answer and
counterclaim, and has moved separately pursuant to Rule 12(b)(6)
of the Federal Rules of Civil Procedure to dismiss defendants'
counterclaims for breach of the duty of good faith and fair
dealing and for abuse of process.  In addition, defendants William
A. Brown, Brown Bottling Group, Raymond Wilkins and Mike
Cottingham have moved for summary judgment on their claim that
they are entitled to rescission of the transaction that is the
subject of plaintiff's complaint and defendants' counterclaims.
The court, having considered the memoranda of authorities,
together with attachments (where applicable), concludes that

defendants' motion for summary judgment should be denied, that
plaintiff's motion for partial summary judgment should be granted
in part and denied in part, and that plaintiff's motions to
dismiss should be denied.

        Background

        This suit arises out of a tax shelter product for
S corporations developed and marketed by the accounting firm KPMG,
which came to be known as the S corporation Charitable
Contribution Strategy (SC2).  Under the SC2 tax strategy,
S corporation shareholders would attempt to transfer the incidence
of taxation on S corporation income by donating S corporation
nonvoting stock to a tax-exempt organization, while retaining the
economic benefits associated with that stock.  See IRS Notice
2004-30.  After the donation of the nonvoting stock to the tax-
exempt party, the parties would claim that the exempt party owned
ninety percent of the stock of the S corporation and that any
taxable income allocated on the nonvoting stock to the exempt
party was not subject to tax on unrelated business income under
the Tax Code.  Thus, the tax benefit to the S corporation voting
shareholders was two-fold: they would benefit by being able to
take a charitable contribution deduction for their stock donation
to the tax-exempt entity, and the shareholders would also benefit
because during the period the stock was held by the tax-exempt
entity, the income of the S corporation would be allocated to the

tax-exempt entity based upon the percentage of shares held by the tax-exempt entity, thereby reducing the voting shareholder's taxable income.  The income allocated to the tax-exempt entity would remain in the S corporation; but the arrangement contemplated that no dividends would be paid by the S corporation while the tax-exempt entity held the stock.

Pursuant to one or more agreements (typically redemption agreements) entered into as part of the transaction, the exempt party would hold the stock for a two- to three-year period, as specified in the agreement, but at the end of that period, would have the right to require the S corporation or the original shareholders to purchase the exempt party's nonvoting stock for an amount equal to the fair market value of the stock as of the date the shares were presented for repurchase.  Id.  Thus, the tax-exempt entity was expected to realize the value of the gift of stock by redemption of the stock.  KPMG developed, promoted and sold this SC2 tax strategy to various tax clients and tax-exempt organizations, including Austin Firefighters Relief and Retirement Fund (AFF) and Brown Bottling Group (BBG).

Plaintiff AFF is a legislatively-created retirement plan which administers pension benefits for members of the City of Austin's Fire Department.  In 2000, KPMG contacted AFF to promote its SC2 tax shelter scheme and eventually recruited AFF to participate in five separate SC2 transactions arranged by KPMG.

3

In an Executive Summary initially provided by KPMG to AFF in
October 2000, prior to the first transaction, KPMG explained its
interest in AFF and outlined the nature of the proposed
transactions, as follows:

> Under a little known IRS ruling (Revenue Ruling 58-154,
> attached for your review), individuals are permitted to
> donate cash and other property to municipal pension plans and
> obtain a tax deduction.  Our client is looking to donate
> certain financial interests in his closely held business and
> thereby obtain a deduction under the above Revenue Ruling.
> The financial interests will be equity interests which will
> not subject the holder to any potential liabilities of the
> business.  We anticipate the fair market value of these
> financial interests will be at least $500,000.
>
> Under Federal and State tax law most holders of
> these financial interests would be taxed on the income
> from the underlying business (including most tax-exempt
> entities because the income will constitute "unrelated
> taxable business taxable income" or "UBTI"), even though
> the income will not actually be distributed to the
> holder.  Therefore, it does not make economic sense for
> most entities to accept these financial interests
> because the tax burden associated with ownership would
> exceed the value of the financial interest.
>
> However it is our understanding that your entity is
> a tax-exempt entity which is not subject to any income
> tax (including UBTI) and would not be taxed on the
> income from ownership of the financial interests.
>
> Your organization would be required to hold the
> financial interest for a minimum specified period of
> time, for example one year.
>
> At the end of that time period your organization
> will have the right to present financial interests for
> redemption, i.e. sell it to the operating entity at fair
> market value for cash.

AFF entered its first SC2 transaction in November 2000, and two additional transactions in December 2000, prior to its transaction with BBG in January 2001.

Around this same time KPMG initiated contact with AFF, Brown, who had inquired of a local KPMG partner about steps he might take to reduce his future taxes, was contacted by another KPMG representative about the SC2 tax strategy.  In September 2000, Brown signed an engagement letter with KPMG for KPMG's services to implement the SC2 tax strategy, and soon thereafter, Brown and BBG began making preparations for implementation of the SC2 transaction.  This included BBG's changing its corporation structure to a Subchapter S corporation and recapitalizing in order that Brown, its sole shareholder, would be able to donate ninety percent of the shares of BBG (all nonvoting shares) to AFF and retain the remaining ten percent (all voting shares).  In anticipation of the transaction, on December 19, 2000, BBG also declared a $4.2 million dividend to Brown as a note with payments to be withdrawn later by Brown.  A month later, on January 25, 2001, KPMG proposed to AFF an SC2 transaction with BBG.[1]

On January 30, after AFF's Board had voted to approve the transaction, Brown executed an assignment of 9,000 shares of the nonvoting common stock of BBG, and on January 31, 2001, AFF

---

[1] Prior to that time, BFF and AFF had no relationship with each other.

executed an Acknowledgment of Receipt of Certificate and
Disclosures and a Representation Concerning Qualified Plan Status.
On February 21, 2001, a Redemption Agreement drawn up by KPMG was
presented to and signed by BBG and AFF to complete the
transaction.  The Redemption Agreement provided that Brown, BBG's
president and sole voting shareholder, would donate his non-voting
common stock (9,000 shares) to AFF and in return, AFF would have
the right to present all of the BBG stock for redemption for a
ten-day period commencing January 31, 2004, and upon such
presentation, BBG would purchase the stock at the fair market
value.  However, the agreement allowed BBG to extend the period
for redemption an additional year until January 1, 2005 by making
a dividend payment of at least $200,000 prior to January 31, 2004.

For the tax years 2001, 2002, 2003 and 2004, the parties
acted in conformance with the SC2 transaction.  BBG's income was
allocated ninety percent to AFF and ten percent to Brown.  As a
tax-exempt entity, AFF did not have to pay taxes on its
ninety-percent allocation.  Brown paid taxes on his ten-percent
allocation.  No dividends were declared and distributed during
2001, 2002 or 2003.  In January 2004, BBG declared and distributed
a dividend of $200,000 to AFF to extend the stock holding period
until January 31, 2005.

Not long thereafter, on April 1, 2004, the Internal Revenue
Service, following a lengthy investigation into abusive tax

shelters being developed, marketed and implemented by accountants, lawyers and financial advisors, issued a notice declaring the SC2 shelter at issue to be an abusive tax avoidance transaction and deemed such arrangements "listed transactions."  IRS Notice 2004-30 (4/1/04).  The IRS also declared that tax-exempt parties in the transactions (including AFF) would be treated as participants in the transactions.  Id.

On February 9, 2005, AFF provided formal notice to BBG of its intent to redeem the BBG stock, as provided in the Redemption Agreement, and on February 21, 2005, AFF presented the BBG stock for redemption.  Although Brown/BBG initially undertook to have the shares appraised, as provided in the Redemption Agreement, Brown/BBG ultimately took the position that the Redemption Agreement was void and unenforceable due to the IRS's disallowance of the tax benefits which were the foundation of the transaction.

Consistent with that position, on April 18, 2006, BBG filed a declaratory judgment action in the Chancery Court of Madison County, Mississippi, seeking a declaration that the Redemption Agreement is void and thus unenforceable due to the IRS's decision to disallow the tax benefits of the SC2 tax strategy.  The BBG suit further demanded the return of the 9,000 shares of nonvoting common stock donated by BBG and currently held by AFF, sought a permanent injunction against AFF's enforcement of the Redemption Agreement, and alleged estoppel and rescission.  That case was

removed to federal court on the basis of diversity jurisdiction, but was eventually dismissed for lack of personal jurisdiction over AFF.

In the meantime, on May 1, 2006, two weeks after BBG had filed its complaint against AFF in state court in Mississippi, AFF filed suit against BBG in federal district court in Texas, alleging that BBG had breached the terms of the Redemption Agreement by failing to redeem and purchase the BBG stock.  On motion by BBG, AFF's Texas suit was dismissed for lack of personal jurisdiction over BBG, following which AFF filed the present lawsuit in this court on April 26, 2007, alleging claims against Brown and BBG for breach of fiduciary duty, against Brown for tortious interference with contract, and against BBG for breach of contract.  Brown and BBG answered and filed a counterclaim, seeking a declaratory judgment that the Redemption Agreement is void and unenforceable and seeking a return of the 9,000 shares of non-voting common stock donated by BBG and held by AFF, a permanent injunction against AFF's enforcement of the Redemption Agreement, and alleging estoppel and rescission.

Subsequently, AFF sought and was granted leave to amend its complaint to add as defendants BBG directors Raymond Wilkins and Mike Cottingham on AFF's existing claim for breach of fiduciary duty and to add claims against all the defendants for allegedly wrongfully withholding dividends from AFF in breach of their

8

common law fiduciary duty and their duty of good faith and fair
dealing, and for oppressive or fraudulent conduct under
Mississippi Code Annotated § 79-4-14.30.  The addition of these
claims by AFF prompted counterclaims by Brown/BBG, and by
Cottingham and Wilkins, for breach of the duty of good faith and
fair dealing and for abuse of process.  Defendants have charged
that AFF's claim based on an alleged entitlement to the payment of
withheld dividends is directly contrary to the terms of the
parties' agreement and in violation of AFF's duty of good faith
and fair dealing.  They further assert that by naming Wilkins and
Cottingham, who were not directors at the time of some of the acts
alleged by AFF, and by asserting claims of statutory oppressive or
fraudulent conduct, and by seeking the dissolution of BBG, AFF had
engaged in abuse of process.

      The Parties' Summary Judgment Motions

      AFF has moved for summary judgment on Brown/BBG's "rescission
defenses" and their "rescission and declaratory judgment claims,"
by which Brown/BBG assert the transaction should be rescinded on
various grounds, including (a) AFF's alleged unclean hands;
(b) unjust enrichment; (c) estoppel; (d) lack of consideration,
failure of consideration and lack of mutuality of obligation;
(e) frustration of purpose; (f) supervening impracticability;
(g) illegality and violation of public policy; (h) the IRS's
alleged determination that AFF was a "facilitator" or a

"participant" in the alleged SC2 transaction; and (i) alleged deprivation of "essential purpose."  AFF maintains that none of these grounds alleged by Brown/BBG provides a basis for rescinding the transaction, and that Brown/BBG's efforts to invalidate or rescind Brown's inter vivos gift of the BBG stock are "utterly without merit" and must fail.

Defendants have themselves moved for summary judgment, seeking an order declaring that Brown and BBG are entitled to rescission of all components of the SC2 transaction with AFF. Specifically defendants purport to seek rescission of Brown's donation to AFF of nonvoting stock of BBG and of the Redemption Agreement, or alternatively, an order declaring the agreement unenforceable, for many of the same reasons identified by AFF in its motion for summary judgment.  In particular, defendants submit that the court should declare not only that the unclean hands doctrine does not preclude rescission of the SC2 transaction, as AFF has contended, but that the court should further rule that the unclean hands doctrine precludes AFF's enforcement of the Redemption Agreement and all components of the SC2 transaction; that the court should declare that defendants are entitled to rescission of all components of the SC2 transaction and should declare that Brown and BBG are relieved from any obligations under the Redemption Agreement on the grounds of impossibility or impracticability, failure of consideration, and/or estoppel; that

10

since the entire purpose of the transaction has been disallowed (i.e., frustrated) by the IRS, the court should declare the SC2 transaction void and/or voidable and rescinded; that on public policy grounds, the court should declare the transaction void and/or voidable and rescinded because AFF should not be allowed to profit from its participation in what the IRS determined was an illegal tax avoidance transaction; and finally, that because Brown's donation of stock to AFF was not a completed gift, the court should declare that Brown still owns all stock in BBG or in the alternative rescind the purported gift of AFF stock.[2]

<u>Was there a Completed Donation/Gift?</u>

The court's analysis of the parties' summary judgment motions begins with the question whether or not Brown's transfer of stock to AFF was a completed inter vivos gift.  Defendants seek summary judgment on their claim that the attempted gift of stock by Brown to AFF was not completed and that Brown remains the owner of all the BBG stock.  In response, AFF argues that Brown made a valid inter vivos gift/donation of the subject stock to AFF, and that

_____

[2]     The ultimate issue in this case is whether Brown's donation of stock to AFF and the Redemption Agreement executed between AFF and BBG as part of the overall SC2 transaction are valid and enforceable after the IRS disallowed the SC2 transaction pursuant to Notice 2004-30.  A second issue is this:  if the Redemption Agreement is valid and enforceable, what is the value of the 9000 shares of non-voting BBG common stock donated to AFF. However, because the court has bifurcated the issues of liability and damages, the parties agree that the issues presently for consideration relate to the validity/enforceability of the transaction.

Brown/BBG's attempts to invalidate that gift are all without merit and must fail.

> In order to meet the requirements of an inter vivos gift, several requirements must be met: (1) there must be a donor competent to make the gift; (2) the gift must be a free and voluntary act on his part done with the intention to make a gift; (3) the gift must be complete with nothing left to be done; (4) the property must be delivered by the donor, and accepted by the donee; (5) the gift must be gratuitous; (6) the gift must be irrevocable.

Hankins v. Hankins, 729 So. 2d 1283, 1287 (Miss. 1999) (citing McLean v. Green, 258 So. 2d 247, 249 (Miss. 1972)).  The party attempting to prove that an inter vivos gift was made must prove these elements by clear and convincing evidence.  In re Estate of Ladner, 909 So. 2d 1051, 1054 (Miss. 2004) (elements are "(1) that the donor was competent to make a gift; (2) that the donation was a voluntary act and the donor had donative intent; (3) that the gift must be complete and not conditional; (4) that delivery was made; and (5) that the gift was irrevocable")(citing In re Estate of Holloway, 515 So. 2d 1217, 1223 (Miss. 1987) (superceded on other grounds by statute).

As part of the SC2 transaction, Brown executed an "Assignment Separate From Certificate," dated January 31, 2001, which recited:

> FOR VALUE RECEIVED, the Undersigned, William A. Brown, hereby gifts, assigns and transfers to the Austin Fire Fighters Relief and Retirement Fund, Nine Thousand (9,000) shares of Nonvoting Common Stock of Brown Bottling Group . . . and does hereby irrevocably constitute and appoint Gina M. Jacobs, Esq., to transfer said stock on the books of the within-named Corporation, with full powers of substitution in the premises.

AFF contemporaneously executed an Acknowledgment of Receipt of Certificate and Disclosures, in which AFF acknowledged receipt of a charitable contribution of the 9,000 shares.  AFF further acknowledged, among other things, that the stock it was receiving was nonvoting common stock and that AFF had no voting rights or powers as a holder of the stock; that there existed no public market for the shares; that any sale of the stock by AFF was subject to Brown's right of first refusal; and that "other than payments that may be made pursuant to the Redemption Agreement entered into by the Corporation and the Municipal Plan, the Corporation is not required to make distributions of income to shareholders, for tax or other purposes, and absent specific action by the Board of Directors of the Corporation, will not be required to make distributions in the foreseeable future."

The parties executed the Redemption Agreement on February 1, 2001, which agreement purported to give AFF the right to present the stock to BBG for payment for a ten-day period commencing January 31, 2004, but allowed BBG to extend the period an additional year until January 31, 2005, by making a dividend payment of at least $200,000 prior to January 31, 2004.

In their motion, and in response to AFF's motion, defendants assert that while Brown/BBG intended that the IRS recognize the stock donation to AFF as a completed gift in order to obtain a charitable deduction, this did not occur.  Rather, the IRS

13

concluded that "the amount received by the exempt party (AFF) was
an accommodation fee, not a charitable gift."  Brown/BBG submit
that in fact, notwithstanding their intention that the IRS would
treat the stock donation as a completed gift, it is clear from the
nature of the transaction that they never intended an
unconditional and irrevocable transfer of the stock, and that, in
fact, AFF also understood from the outset that the transfer of
stock to AFF by Brown was not an unconditional and irrevocable
gift from Brown and BBG to AFF, but was instead part of an overall
tax strategy whereby AFF would hold the stock for a minimum period
of time in hopes of future income from Brown and BBG in the form
of a redemption.

      In fact, it is manifest from the evidence that upon entering
the transaction, AFF understood that at some point in time, it was
going to have the shares redeemed.  However, there is no proof
that this understanding was a function of any explicit agreement
on the part of AFF to sell the stock to Brown/BBG; rather, it was
a function of the practicalities of the parties' arrangement.
There was nothing in the parties' agreement(s), explicit or
implicit, that <u>required</u> AFF to redeem the shares at any time.  The
Redemption Agreement gave AFF the <u>right</u> to redeem the shares, but
not the obligation to do so.  And the agreement specifically
provided that "[n]o party shall have the right to compel the

14

Municipal Plan to offer the Nonvoting Common Stock for redemption in accordance with this agreement."

Yet there is no doubt that AFF intended to redeem the stock because the only value of the stock to AFF was in AFF's right to redeem.  Though it now contends otherwise, AFF acknowledged upon receipt of the stock that there was no public market for the shares, and that "other than payments that may be made pursuant to the Redemption Agreement entered into by the Corporation and the Municipal Plan, the Corporation is not required to make distributions of income to shareholders, for tax or other purposes, and absent specific action by the Board of Directors of the Corporation, will not be required to make distributions in the foreseeable future."  The Redemption Agreement likewise recognized this, reciting that "without a redemption agreement, the Municipal Plan will have no ready market in which to sell any of the Nonvoting Common Stock in the Corporation contributed to it." Thus, whether or not it was <u>required to</u> do so, there is no doubt that the parties intended and expected that AFF would redeem the stock.[3]  However, as AFF points out, the fact that it always

---

[3]     The court notes that the transfer of the stock was not entirely without conditions.  AFF was not free to sell the stock to anyone without first offering it for sale to Brown/BBG pursuant to the Redemption Agreement.  But the imposition of a right of first refusal was really no condition at all, since the parties explicitly recognized that there was no market for the stock and that the only value of the stock was in AFF's right under the Redemption Agreement to sell the stock to Brown/BBG.

intended to redeem the stock adds nothing, because most charitable
or tax-exempt entities eventually intend to dispose of contributed
stock to raise cash for their mission.

Moreover, while Brown/BBG imply that the "donation" of the
stock was conditioned on Brown/BBG receiving favorable tax
treatment from the IRS in the form of a charitable contribution
deduction and allocation of income to AFF during the time AFF held
the BBG stock, nothing in any of the documents executed as part of
the transaction references any such condition or contingency
regarding Brown's or BBG's gaining a charitable contribution or
other tax benefit from income allocation to AFF and away from
Brown.  Nor, for that matter, is there any evidence that AFF
agreed, implicitly or otherwise, that such a condition was part of
the transaction.

In light of the evidence, the court cannot conclude as a
matter of law that Brown's gift of the stock was not complete and
therefore will deny defendants' motion for summary judgment on
this issue.  Defendants submit, alternatively, that even if the
transaction did result in a completed gift, there are numerous
grounds for rescinding the transaction in its entirety.  AFF
contends otherwise.


The Unclean Hands Doctrine

16

The unclean hands doctrine is grounded on the maxim, "[H]e who comes into equity must come with clean hands." In re Estate of Richardson, 903 So. 2d 51 (Miss. 2005) (quoting Thigpen v. Kennedy, 238 So. 2d 744 (Miss. 1970)).  "The meaning of this maxim is to declare that no person as a complaining party can have the aide of a court of equity when his conduct with respect to the transaction in question has been characterized by wilful inequity. . . ."  Thus, for example, in Walters v. Patterson, 531 So. 2d 581 (Miss. 1988), where Walters sought the return of property he had transferred to Patterson with the purpose of concealing it from the IRS, claiming that he and Patterson had reached an oral agreement that Walters would be permitted to redeem the property in the future, the court refused relief on the basis of the unclean hands doctrine, finding that the transfer for the purpose of tax evasion was contrary to public policy.  Id. at 584.  See also Ellzey v. James, 970 So. 2d 193, 196 (Miss. App. 2007) (describing doctrine and citing Walters).

In their motion, defendants ask the court to hold as a matter of law that the unclean hands doctrine does not preclude them from seeking rescission of the SC2 transaction because, although it was subsequently determined by the IRS that the transaction was an abusive tax scheme, neither Brown and BBG, nor AFF for that matter, entered the transaction with wilful inequity toward the other.  AFF does not dispute this in its response to the motion;

17

in fact, it does not even address defendants' argument on this point.

However, AFF does challenge defendants' further assertion that the transaction should be rescinded on account of AFF's unclean hands.  Again, defendants do not contend that AFF entered into the transaction initially with unclean hands; rather, they argue that after the IRS concluded the SC2 transaction was an abusive tax avoidance transaction and declared that tax-exempt parties in these transactions, including AFF, would be treated as participants in the transactions, AFF, notwithstanding that it had been found to be a participant in the transaction, sued defendants to enforce the Redemption Agreement.  Defendants posit that such acts by AFF "constitute wilful inequity toward Defendants which makes the unclean hands doctrine applicable to AFF's claims to enforce key elements of the now known to be illegal SC2 transaction."  The court rejects this argument.  Even if the court assumes that AFF's claims in this action have no merit, AFF still cannot reasonably be found to have acted with wilful inequity toward defendants merely by virtue of filing this lawsuit to enforce the Redemption Agreement or to otherwise enforce the terms of the SC2 transaction.  Cf. Moon v. Condere Corp., 690 So. 2d 1191, 1197 (Miss. 1997) (holding that the defendant did not abuse the process of court when all he did was file a simple summons

18

requiring the plaintiff to defend a suit) (citing <u>Edmonds v. Delta
Democrat Publishing Co.</u>, 93 So. 2d 171, 230 Miss. 583 (1957)).

> <u>Unjust Enrichment</u>

> The doctrine of unjust enrichment or recovery in
> quasi-contract applies to situations where there is no
> legal contract but where the person sought to be charged
> is in possession of money or property which in good
> conscience and justice he should not retain but should
> deliver to another, the courts imposing a duty to refund
> the money or the use value of the property to the person
> to whom in good conscience it sought to belong.

<u>Omnibank of Mantee v. United Southern Bank</u>, 607 So. 2d 76, 92
(Miss. 1992) (quoting <u>Hans v. Hans</u>, 482 So. 2d 1117, 1122 (Miss.
1986)).

In its motion, AFF points to the following quote from
<u>Omnibank of Mantee</u>:

> A person is enriched when he receives an economic
> benefit.  This includes positive profits, a loss
> avoided, as well as discharge of debts.  What is
> important and what careless readers often fail to
> remember is our law accepts no value condemning pursuit
> of wealth, so long as it be done within legal
> parameters.  There is nothing inherently unjust about
> enrichment.  The principle does not proscribe mere
> enrichments, only those objectively seen as unjust.

<u>Id</u>.  AFF argues that its enrichment from Brown's gift was not
"unjust," in that even though it gave no value for the donation,
defendants can point to no misleading or wrongful act by AFF.

Although defendants urge that public policy considerations
warrant rescission of the transaction based on AFF's participation
in/facilitation of an "illegal tax transaction," defendants have
not responded to AFF's motion as to the specific claim/defense of

19

unjust enrichment.  Accordingly, the court will grant AFF's motion on this claim/defense.

Estoppel

Defendants argue that they are entitled to rescission of all components of the SC2 transaction on grounds of estoppel.  In this regard, defendants argue as follows:  AFF knew that Brown/BBG entered into the SC2 transaction in order that Brown could receive a charitable contribution deduction for the stock donated to AFF, and so Brown would be entitled to allocate the income of BBG to AFF during the time AFF held the BBG stock; AFF knew that its participation in the SC2 transaction was predicated upon its tax status as a municipal tax-exempt entity; AFF knew this transaction was not merely a gift but rather part of an overall tax strategy from which both parties were seeking to benefit until the IRS declared the transaction illegal; that AFF was an active participant in this tax avoidance scheme; and that in view of these facts, AFF should not be permitted to profit from the transaction, at the expense of Brown and BBG.

Estoppel "forbids one from both gaining a benefit under a contract and then avoiding the obligations of the same contract." Bailey v. Kemp Estate, 955 So. 2d 777, 782 (Miss. 2007).

> Estoppel requires a number of essential elements: (1) a
> representation that later proves to be untrue, (2) an
> action by the person seeking to invoke the doctrine,
> such action being undertaken in justifiable reliance on
> the representation, and (3) a resulting detriment to

20

that person arising from his action.  <u>Town of Florence v. Sea Lands, Ltd.</u>, 759 So. 2d 1221, 1229 (Miss. 2000).
<u>Lynch v. Mississippi Farm Bureau Cas. Ins. Co.</u>, 880 So. 2d 1065, 1072 (Miss. Ct. App. 2004) (quoting <u>Miss. Dept. of Pub. Safety v. Carver</u>, 809 So. 2d 713, 718 (Miss. Ct. App. 2001)).  Defendants have failed to demonstrate that the estoppel doctrine could properly be applied here.

   <u>Impossibility or Impracticability</u>

   Defendants argue they are entitled to rescission of all components of the SC2 transaction on grounds of impossibility or impracticability.  The law in Mississippi on the doctrine of impossibility of performance is clear.  The general rule is this: "The mere fact that a contract becomes burdensome or even impossible to perform does not for that reason alone excuse performance."  <u>Hendrick v. Green</u>, 618 So. 2d 76 (Miss. 1993).  The Supreme Court expounded on the doctrine in <u>Hendrick</u>, stating,

> This Court said in the case of <u>Piaggio v. Somerville</u>, 119 Miss. 6, 80 So. 342, 344 [1918]: 'when a party by his own contract creates a duty or charge upon himself he is bound to discharge it, although to do so should subsequently become unexpectedly burdensome or even impossible; the answer to th e objection of hardship in all cases such being that it might have been guarded against by proper stipulation'.  [Citations omitted.]
>
> In the case of <u>Harmon v. Fleming</u>, 25 Miss. 135, 142 [1852], this Court said: 'We find the common law rule, on this subject, stated in the following manner: [w]here the law casts a duty on a party, the performance shall be excused, if it be rendered impossible by the act of God.  But where a party, by his own contract, engages to do an act, it is deemed to be his own fault and folly, that he did not thereby expressly provide against

21

contingencies, and exempt himself from liability in
certain events; and in such case, therefore, that is, in
the instance of an absolute and general contract, the
performance is not excused by an inevitable accident or
other contingency, although not foreseen by, or within
the control of the party'.

In the case of Piaggio v. Somerville, supra, three
exceptions are recognized: 1. A subsequent change in
the law, whereby performance becomes unlawful. 2. The
destruction, from no fault of either party, of the
specified thing, the continued existence of which is
essential to the performance of the contract. 3. The
death or incapacitating illness of the promisor in a
contract which has for its objective the rendering of
personal services.

Hendrick, 618 So. 2d at 78–79 (quoting Browne & Bryan Lumber Co.
v. Toney, 188 Miss. 71, 82–82, 194 So. 296, 298 (1940)); see also
id. (observing that "[i]mpossibility of performance is determined
by whether an unanticipated circumstance has made performance of
the promise vitally different from what should reasonably have
been within the contemplation of both parties when they entered
into the contract") (citing Littleton v. Employees Fire Ins. Co.,
169 Colo. 104, 453 P.2d 810 (1969)).

The facts of this case do not support defendants' reliance on
the impossibility doctrine.  Defendants purport to rely on
Piaggio's recognition of an exception where there is a subsequent
change in the law which makes a contract illegal.  But even
assuming for the sake of argument that the transaction was
"illegal," there was no change in the law which made it so.
Rather, as AFF correctly points out in its response, the IRS's
conclusion was based on its interpretation and application of

22

existing law to the transaction.  Moreover, while one might fairly

assume that KPMG downplayed the risk, it is nevertheless clear

from the record that KMPG expressly informed Brown/BBG of the risk

that the IRS might not recognize the validity of the transaction.

This risk plainly was not unanticipated.[4]

Frustration of Purpose

"The doctrine of frustration of purpose excuses performance

by a party where the value of the performance to at least one of

the parties, and the basic rationale recognized by both parties

entering into the contract, has been destroyed by a supervening

---

[4]     For this same reason, defendants' reliance on the
doctrine of "impracticability" is misplaced.  In their motion,
although defendants argue they are entitled to rescission based on
the doctrine of "impracticability," their arguments relate solely
to the "impossibility" doctrine, perhaps because the Mississippi
Supreme Court has recognized that the doctrines are essentially
the same.  The doctrine of supervening impracticability holds that
> [w]here, after a contract is made, a party's performance
> is made impracticable without his fault by the
> occurrence of an event the non-occurrence of which was a
> basic assumption on which the contract was made, his
> duty to render that performance is discharged, unless
> the language or the circumstances indicate the contrary.
City of Starkville v. 4-County Elec. Power Ass'n, 819 So. 2d 1216,
1224 (Miss. 2002) (quoting Restatement (Second) of Contracts
§ 261).  In City of Starkville, the court observed that while
"Mississippi has recognized the doctrine of impossibility but not
the doctrine of impracticability," the "trend appears to be toward
treating these doctrines similarly, and many courts even use the
terms interchangeably."  Id. (noting that Comment d to Restatement
§ 261 explains "[a]lthough the rule stated in this Section is
sometimes phrased in terms of 'impossibility,' it has long been
recognized that it may operate to discharge a party's duty even
though the event has not made performance absolutely impossible.
This Section, therefore, uses 'impracticable,' the term employed
by Uniform Commercial Code S 2-615(a), to describe the required
extent of the impediment to performance.").

and unforeseen event." <u>City of Starkville</u>, 819 So. 2d at 1225

(citing 18 <u>Williston on Contracts</u> § 1935 (3d ed. 1978)).  The

<u>Restatement of Contracts</u> § 265, entitled Discharge by Supervening

Frustration, describes the doctrine as follows:

> Where, after a contract is made, a party's principal
> purpose is substantially frustrated without his fault by
> the occurrence of an event and the nonoccurrence of
> which was a basic assumption on which the contract was
> made, his remaining duties to render performance are
> discharged, unless the language or the circumstances
> indicate the contrary.

Although the Mississippi Supreme Court "has not recognized

frustration of purpose as a defense to a breach of contract

action," <u>City of Starkville</u>, 819 So. 2d at 1225, the court in <u>City</u>

<u>of Starkville</u> did explain the requirements of the doctrine as set

forth in the <u>Restatement</u>, stating:

> Section 265 requires that three criteria must be met
> before courts will find frustration of purpose.  First,
> the purpose that is frustrated must have been a
> principal purpose of that party in making the contract.
> The object must be so completely the basis of the
> contract that, as both parties understand, without it
> the transaction would make little sense.  Second, the
> frustration must be substantial.  It is not enough that
> the transaction has become less profitable for the
> affected party or even that he will sustain a loss.  The
> frustration must be so severe that it is not fairly to
> be regarded as within the risks that he assumed under
> the contract.  Third, the non-occurrence of the
> frustrating event must have been a basic assumption on
> which the contract was made. <u>Restatement (Second) of</u>
> <u>Contracts</u> § 265 cmt. a (1981).

<u>Id.</u> at 1225.  Elaborating on the second criterion, the court in

<u>City of Starkville</u> explained that the requirement that the

frustration be substantial, i.e., "so severe that it is not fairly

to be regarded as within the risks . . . assumed under the contract," is a requirement that takes into account the foreseeability of the event which is claimed to have resulted in the alleged frustration of purpose.  Id.  The court declared that, "[a]s with the impossibility defense, 'if a contingency may be guarded against by the parties in the contract, i.e., it is foreseeable or within the control of one of the parties, its occurrence will not discharge the parties' obligations under the contract.'"  Id. (quoting Green, 618 So. 2d at 78).  Thus, even assuming for the sake of argument that the Mississippi courts would recognize the frustration defense, the doctrine cannot apply here because the risk that Brown/BBG would not receive the favorable tax treatment desired was disclosed by KPMP and hence was a foreseeable event.  See Wal-Mart Stores, Inc. v. AIG Life Ins. Co., 901 A.2d 106, 113 (Del. 2006) (holding that Wal-Mart failed to state claim for frustration where risk that tax deductions would not be allowed were disclosed to Wal-Mart, which thus "assumed the risk that its tax deductions would be allowed").

Lack of Consideration/Failure of Consideration

Defendants argue that because the entire SC2 transaction was based on AFF's ability to enable Brown to obtain a charitable deduction an allocation of income to AFF, and because AFF was unable to provide Brown and BBG the ability to realize the tax benefits as a result of the IRS's determination that the SC2 was a

25

tax avoidance transaction, then the court should conclude as a matter of law that there has been a failure of consideration which warrants rescission.  On the other side, AFF argues that, as a matter of law, there has been no failure of consideration or lack of consideration because a valid gift, such as was made by Brown, is gratuitous and does not require consideration.  See Carter v. State Mut. Savs. & Loan Assoc., 498 So. 2d 324, 327 (Miss. 1986). It argues, alternatively, that there was no lack of consideration, in light of the parties' mutual promises respecting redemption of the shares; and that there was no failure of consideration, because AFF made no promise to provide Brown and BBG the ability to realize the tax benefits they desired.  AFF's position is correct on each of these points.

### Illegality/Public Policy

Defendants broadly argues,

> To support and protect the public policy against participation in illegal tax transactions the court should rescind all facets of the SC2 transaction, including the donation to AFF by Brown, not allow AFF to enforce the Redemption Agreement and put the parties in the position that they were before KPMG recruited them for the SC2 transaction.  Otherwise, AFF will profit from the illegal tax transaction in violation of public policy.

The court has thoroughly reviewed and considered the parties' arguments on this issue.  The court is aware of AFF's arguments in opposition to defendants' illegality/public policy position, and while the court cannot at this time conclude as a matter of law

26

that the transaction should be undone on this basis, neither can
the court conclude that it should not be.  Accordingly, the court
will deny the parties' motions for summary judgment on this issue.

AFF's Motions to Dismiss

In addition to its partial summary judgment motion, AFF has
filed motions to dismiss all the defendants' counterclaims against
it for breach of the duty of good faith and fair dealing and abuse
of process.  Defendants pled these counterclaims following AFF's
filing of its amended complaint, in which it alleged the
following:

> [P]rior to issuance of the non-voting stock, Brown and
> the other Defendants conspired to and instituted a plan
> by which (a) BBG would give Brown a ruse promissory note
> to secretly pay Brown dividends in 2001-2003, after
> [AFF] had obtained its stock, without [AFF] sharing in
> these dividends, and (b) [AFF] otherwise would be
> wrongfully deprived of dividends while it held the 9,000
> shares, regardless of retained earnings available for
> dividends, so retained earnings withheld from
> distribution could be saved and distributed to Brown
> after redemption.

AFF alleged that after the IRS denied Brown some or all of his
hoped-for tax benefits, "Defendants continued the conspiracy to
withhold dividends to [AFF]," notwithstanding that BBG had
accumulated at least $7.2 million that was available for
dividends.  Based on these allegations, AFF has asserted a claim
against defendants for common law fraud, oppression, breach of
fiduciary duty and duty of fair dealing, and breach of statutory

director/officer duty of good faith by BBG, Brown, Wilkins, and

Cottingham, declaring that:

> By embarking upon and/or carrying out a scheme and plan
> to inequitably engineer the ruse of the $4.2 note to pay
> Brown dividends in 2001-2003 while paying none to Austin
> Firefighters Fund, and further to generally and improperly
> withhold dividends from Austin Firefighters Fund and to
> deprive it of the value of its non-voting stock, BBG, Brown,
> Wilkins, and Cottingham committed and conspired to commit
> fraud, oppression and breach of fiduciary duty at common law
> and such individual defendants breached their duty of good
> faith under Miss. Code §§ 79-4-8.30 and/or 79-4-8.42.. .

AFF charges that

> [b]y reason of such wrongful acts [AFF] has been
> proximately injured and has suffered actual damages,
> including the fair market value of its stock and by the
> failure to receive reasonable dividends given the
> circumstances and reasonable business needs of BBG,
> including its rightful 90% of the $4.2 million paid by
> BBG to Brown in 2001-2003, all in an amount to be
> determined by the trier of fact. . .

AFF further asserts that defendants have acted "in a manner that

is ... oppressive or fraudulent" under Miss. Code § 79-4-14.30,

and that,

> [b]y reason of such acts and omissions, [AFF] is
> entitled to judicial dissolution of BBG under such
> provision.  Or should BBG or Brown, respectively, elect
> to purchase [AFF's] shares, then [AFF] is entitled to
> the "fair value of the shares," Miss. Code §
> 79-4-14.34(a), which is to be determined "[w]ithout
> discounting for lack of marketability or minority status
> . . ." under Miss. Code § 79-4-13.01(4)(iii).

> If the parties are unable to reach an agreement on fair
> value, [AFF] is entitled to a court determination of
> such fair value as of the day before the date on which
> its petition under Section 79-4-14.30(2) was filed, or
> as of such other date as the court deems appropriate
> under the circumstances.  Miss. Code § 79-4-14.34(d).

28

In response to these allegations and claims by AFF, defendants filed counterclaims against AFF for breach of the duty of good faith and fair dealing and for abuse of process.  These claims are both grounded on defendants' allegations that AFF's factual allegations and claims are not warranted or supported by the facts or existing law, and were asserted "[a]s a ruse and in an attempt to improperly coerce Brown and BBG to pay money to which AFF is not legally entitled."  Getting more specific, defendants charge that AFF's claim that it was/is entitled to recoup dividend payments is directly contradicted by the documents executed by AFF in connection with the transaction, in addition to its prior knowledge regarding the structure of the SC2 transactions, and that AFF's attempting to obtain funds from Brown and BBG contrary to the documents that it executed as part of the SC2 transaction with Brown and BBG, amounts to a breach of AFF's implied duty of good faith and fair dealing.  Defendants further allege that AFF has enaged in abuse of process by seeking judicial dissolution of BBG without justification and for reasons that are wholly contrary to the documents AFF executed as part of the SC2 transaction.

Certain realities of the parties' transaction are apparent from the evidence of record, including the fact that the parties' arrangement contemplated that no dividends would be paid by BBG to AFF while AFF held the subject stock.  All the evidence of record

29

thus far demonstrates beyond reasonable challenge that AFF
understood and knew that Brown/BBG's purpose in entering the
transaction was to obtain favorable tax treatment in the form both
of a charitable contribution deduction and directing income away
from BBG and to the tax-exempt AFF; that AFF knew and understood
that the value of Brown/BBG's putative "gift" or donation of the
subject stock was in AFF's right to redeem the stock; and AFF knew
that the transaction was intentionally structured so that it would
not receive dividends on the stock during the time it held the
stock, other than as might be paid by Brown/BBG for the purpose of
extending the time during which AFF would agree to hold the stock
prior to redemption.  By all indications, AFF expected to realize
the value of the gift of stock by redemption of the stock, not by
the receipt of dividends.  In the Executive Summary provided by
KPMG to AFF describing proposed SC2 transactions, KPMG explained
that "income will not actually be distributed to the holder."  In
executing the Acknowledgment of Receipt, AFF explicitly
acknowledged that BBG was not required to make distributions of
income to shareholders for any purpose, and absent specific action
by BBG's Board of Directors, BBG would not be required to make
distributions in the foreseeable future.  And the Redemption
Agreement recites that the price at which BBG would repurchase the
shares from AFF was the fair market value on the date presented
for redemption, which value was to be determined taking into

30

account, among other things, "that the Corporation is not
obligated to pay dividends."  The transfer of the stock was not
intended to and did not include a transfer of the right to receive
dividends; in purpose and effect, the "gift" was of the right to
redeem, and to do so at a price which the parties expressly agreed
and acknowledged would take into account the fact that BBG was not
obligated to pay dividends on the stock.  Thus, based on the
evidenced adduced to date, defendants would seem to be correct,
that AFF's claim for the recovery of dividend payments is
unsupported by the facts and law, as being directly contrary to
the parties' intent and understanding of their arrangement.
However, it does not follow from the fact that defendants have a
likely meritorious defense to AFF's claims for fraud, breach of
fiduciary duty, and breach of an alleged statutory and common law
duty to pay dividends, that defendants have stated a cognizable
claim for breach of the duty of good faith and fair dealing.

   "The tort of breach of a duty of fair dealing, which
emanates from the law on contracts, provides that '[a]ll contracts
contain an implied covenant of good faith and fair dealing in
performance and enforcement.'"  Braidfoot v. William Carey
College, 793 So. 2d 642, 651 (Miss. Ct. App. 2000) (quoting Morris
v. Macione, 546 So. 2d 969, 971 (Miss. 1989)).  "The implied
covenant operates only where there is already an existing
contract."  Cothern v. Vickers, Inc., 759 So. 2d 1241, 1248 (Miss.

31

2000).  AFF correctly points out in its motion to dismiss that the KPMG Executive Summary is not a contract and thus can provide no basis for a breach of good faith and fair dealing claim.  In the court's opinion, AFF is also correct in its assertion that the Acknowledgment of Receipt signed by AFF is not a contract but rather simply what it says it is, an acknowledgment by AFF of its receipt of a charitable contribution of the subject stock.  The Redemption Agreement is a contract, but the only parties to that contract are AFF and BBG, and thus, this agreement provides no basis for any claim by Brown, Cottingham or Wilkins for breach of the duty of good faith.

AFF argues that while BBG is a party to the Redemption Agreement, BBG cannot state a claim against AFF for breach of the duty of good faith and fair dealing because its claims in this cause are not inconsistent with the terms of that agreement.  In the court's opinion, that is not so.  In its amended complaint, AFF alleges that defendants attempted "to artificially depress the 'fair market value' for redemption under the Redemption Agreement by preventing dividends that would demonstrate a history of distributions for purposes of valuing [AFF's] stock," and asserts it "has suffered actual damages, including the fair market value of its stock . . . ."  Such an allegation would appear contrary to the provision in the Redemption Agreement that the determination of "fair market value" will take into account "that the

Corporation is not obligated to pay dividends."  The court will thus deny AFF's motion as it relates to BBG's claim against it for breach of the duty of good faith.

The elements of a claim for abuse of process are "(1) the party made an illegal use of a legal process, (2) the party had an ulterior motive, and (3) damage resulted from the perverted use of process."  Ayles v. Allen, 907 So. 2d 300, 303 (Miss. 2005).  As the court understands it, defendants' abuse of process claim in this case is that AFF has asserted what it knows to be an unfounded and unwarranted claim for dissolution of BBG, using the threat of dissolution as a means to coerce defendants to settle the suit on terms AFF believes to be in its favor.  AFF has moved to dismiss the claim, arguing that the mere filing of a suit cannot give rise to a cause of action for abuse of process.  See Moon v. Condere Corp., 690 So. 2d 1191 (Miss. 1997).

Defendants respond that while they recognize that the mere filing of a suit cannot give rise to a cause of action for abuse of process, AFF's actions and allegations against the defendants "rise well above the mere institution of litigation," in that AFF, "through improper motives in the First Amended Complaint, has threatened the very existence of the corporate operations of BBG through a cause of action for judicial dissolution," and has done so not for any arguably legitimate purpose, but rather with an ulterior motive of forcing defendants to settle rather than risk

33

the dissolution of BBG.  In the court's opinion, defendants have stated a cognizable claim for abuse of process.

Conclusion

Based on the foregoing, it is ordered that Brown/BBG's motion for summary judgment is denied; AFF's motion for partial summary judgment is granted in part and denied in part, as set forth herein; and AFF's motions to dismiss are denied.

SO ORDERED this 29th day of September, 2008.


/s/ Tom S. Lee
UNITED STATES DISTRICT JUDGE