UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF MISSISSIPPI
JACKSON DIVISION

AUSTIN FIREFIGHTERS RELIEF AND
RETIREMENT FUND

PLAINTIFF/COUNTERDEFENDANT

VS.                    CIVIL ACTION NO. 3:07CV228TSL-JCS


WILLIAM A. BROWN, BROWN BOTTLING
GROUP, INC., RAYMOND WILKINS AND
MIKE COTTINGHAM                DEFENDANTS/COUNTERPLAINTIFF

MEMORANDUM OPINION AND ORDER

This cause is before the court on the following motions by the parties:

- Second motion of defendants/counterplaintiffs William A. Brown, Brown Bottling Group, Inc., Raymond Wilkins and Mike Cottingham for summary judgment for rescission, or in the alternative, motion for partial summary judgment on specific claims in the first amended complaint [Docs. 157 & 175];

- AFF's Rule 56(f) motion for continuance [Doc. 200];

- Second motion of plaintiff/counterdefendant Austin Firefighters Relief and Retirement Fund (AFF) for partial summary judgment [Doc. 164];

- Defendants' motion to exclude certain expert testimony of Edith F. Moates [Doc 159];

- AFF's motion for reconsideration of the court's June 26th, 2009 order relating to AFF's objections to the magistrate judge's March 10, 2009 orders [Doc. 213];

- AFF's motion for review of magistrate judge's order [Doc. 232];

- Defendants' motion to exclude the affidavit of James M. "Mike" Hill and Exhibit "A" attached thereto [Doc. 196]; and

- AFF's motion to exclude expert testimony of David L. Black [Doc. 162].

The court's rulings on these various motions are set forth herein.

The basic background facts, which were set forth in an earlier opinion entered by the court in this cause in September 2008, see Austin Firefighters Relief and Retirement Fund v. Brown et al., 2008 WL 4450253 (S.D. Miss. Sept. 29, 2008), are largely undisputed. This suit arises out of a tax shelter product for S corporations developed and marketed by the accounting firm KPMG, which came to be known as the S corporation Charitable Contribution Strategy (SC2). Under the SC2 tax strategy, S corporation shareholders would attempt to transfer the incidence of taxation on S corporation income by donating S corporation non-voting stock to a tax-exempt organization, while retaining the economic benefits associated with that stock. See IRS Notice

2

2004-30.  After the donation of the non-voting stock to the tax-exempt entity. the parties would claim that the tax-exempt eneity owned ninety percent of the stock of the S corporation and that any taxable income allocated on the non-voting stock to the exempt party was not subject to tax on unrelated business income under the Tax Code.  Thus, the tax benefit to the S corporation voting shareholders was two-fold: they would benefit by being able to take a charitable contribution deduction for their stock donation to the tax-exempt entity, and the shareholders would also benefit because during the period the stock was held by the tax-exempt entity, the income of the S corporation would be allocated to the tax-exempt entity based upon the percentage of shares held by the tax-exempt entity, thereby reducing the voting shareholders' taxable income.  Another feature of the strategy was that while income allocated to the tax-exempt entity would remain in the S corporation, no dividends would be paid by the S corporation while the tax-exempt entity held the stock.

Pursuant to one or more agreements (typically redemption agreements) entered into as part of the transaction, the exempt party would hold the stock for a two- to three-year period, as specified in the agreement, but at the end of that period, would have the right to require the S corporation or the original shareholders to purchase the exempt party's non-voting stock for an amount equal to the fair market value of the stock as of the

date the shares were presented for repurchase.  KPMG developed, promoted and sold this SC2 tax strategy to various tax clients and tax-exempt organizations, including AFF and William Brown and his company, BBG.

Plaintiff AFF is a legislatively-created retirement plan which administers pension benefits for members of the City of Austin's Fire Department.  In 2000, KPMG contacted AFF to promote its SC2 tax shelter scheme and eventually recruited AFF to participate in five separate SC2 transactions arranged by KPMG. In an Executive Summary initially provided by KPMG to AFF in October 2000, prior to the first transaction, KPMG explained its interest in AFF and outlined the nature of the proposed transactions, as follows:

> Under a little known IRS ruling (Revenue Ruling 58-154, attached for your review), individuals are permitted to donate cash and other property to municipal pension plans and obtain a tax deduction.  Our client is looking to donate certain financial interests in his closely held business and thereby obtain a deduction under the above Revenue Ruling.  The financial interests will be equity interests which will not subject the holder to any potential liabilities of the business.  We anticipate the fair market value of these financial interests will be at least $500,000.
>
> Under Federal and State tax law most holders of these financial interests would be taxed on the income from the underlying business (including most tax-exempt entities because the income will constitute "unrelated taxable business taxable income" or "UBTI"), even though the income will not actually be distributed to the holder.  Therefore, it does not make economic sense for most entities to accept these financial interests because the tax burden associated with ownership would exceed the value of the financial interest.

4

However it is our understanding that your entity is a tax-exempt entity which is not subject to any income tax (including UBTI) and would not be taxed on the income from ownership of the financial interests.

Your organization would be required to hold the financial interest for a minimum specified period of time, for example one year.

At the end of that time period your organization will have the right to present financial interests for redemption, i.e. sell it to the operating entity at fair market value for cash.

AFF entered its first SC2 transaction in November 2000, and two additional transactions in December 2000, prior to its transaction with BBG in January 2001.

Around this same time KPMG initiated contact with AFF, a KPMG representative proposed the SC2 tax strategy to Brown. In September 2000, Brown signed an engagement letter with KPMG for KPMG's services to implement the SC2 tax strategy, and soon thereafter, Brown and BBG began making preparations for implementation of the SC2 transaction. This included BBG's changing its corporation structure to a Subchapter S corporation and recapitalizing in order that Brown, its sole shareholder, would be able to donate ninety percent of the shares of BBG (all non-voting shares) to AFF and retain the remaining ten percent (all voting shares). In anticipation of the transaction, on December 19, 2000, BBG also declared a $4.2 million dividend to Brown as a note with payments to be withdrawn later by Brown. A

month later, on January 25, 2001, KPMG proposed to AFF an SC2 transaction with BBG.

On January 30, after AFF's Board had voted to approve the transaction, Brown executed an assignment of 9,000 shares of the non-voting common stock of BBG, and on January 31, 2001, AFF executed an Acknowledgment of Receipt of Certificate and Disclosures and a Representation Concerning Qualified Plan Status. On February 21, 2001, a Redemption Agreement drawn up by KPMG was presented to and signed by BBG and AFF to complete the transaction. The Redemption Agreement provided that Brown, BBG's president and sole voting shareholder, would donate his non-voting common stock (9,000 shares) to AFF and in return, AFF would have the right to present all of the BBG stock for redemption for a ten-day period commencing January 31, 2004, and upon such presentation, BBG would purchase the stock at the fair market value. However, the agreement allowed BBG to extend the period for redemption an additional year until January 1, 2005 by making a dividend payment of at least $200,000 prior to January 31, 2004.

For the tax years 2001, 2002, 2003 and 2004, the parties acted in conformance with the SC2 transaction. BBG's income was allocated ninety percent to AFF and ten percent to Brown. As a tax-exempt entity, AFF did not pay taxes on its ninety-percent allocation. Brown paid taxes on his ten-percent allocation. No dividends were declared and distributed during 2001, 2002 or 2003.

In January 2004, BBG declared and distributed a dividend of $200,000 to AFF to extend the stock holding period until January 31, 2005. Not long thereafter, on April 1, 2004, the Internal Revenue Service, following a lengthy investigation into abusive tax shelters being developed, marketed and implemented by accountants, lawyers and financial advisors, issued a notice declaring the SC2 shelter at issue to be an abusive tax avoidance transaction and deemed such arrangements "listed transactions." IRS Notice 2004-30 (4/1/04). The IRS also declared that tax-exempt parties in the transactions (including AFF) would be treated as participants in the transactions. Id.

On February 9, 2005, AFF provided formal notice to BBG of its intent to redeem the BBG stock, as provided in the Redemption Agreement, and on February 21, 2005, AFF presented the BBG stock for redemption. Although Brown/BBG initially undertook to have the shares appraised, as provided in the Redemption Agreement, Brown/BBG ultimately took the position that the Redemption Agreement was void and unenforceable due to the IRS's disallowance of the tax benefits which were the foundation of the transaction. Consistent with that position, on April 18, 2006, BBG filed a declaratory judgment action in the Chancery Court of Madison County, Mississippi, seeking a declaration that the Redemption Agreement is void and unenforceable due to the IRS's decision to disallow the tax benefits of the SC2 tax strategy. The BBG

suit further demanded the return of the 9,000 shares of non-voting common stock donated by BBG and currently held by AFF, sought a permanent injunction against AFF's enforcement of the Redemption Agreement, and alleged estoppel and rescission. That case was removed to federal court on the basis of diversity jurisdiction, but was eventually dismissed for lack of personal jurisdiction over AFF.

In the meantime, on May 1, 2006, two weeks after BBG had filed its complaint against AFF in state court in Mississippi, AFF filed suit against BBG in federal district court in Texas, alleging that BBG had breached the Redemption Agreement by failing to redeem and purchase the BBG stock. AFF's Texas suit was dismissed for lack of personal jurisdiction over BBG, following which AFF filed the present lawsuit in this court on April 26, 2007, alleging claims against Brown and BBG for breach of fiduciary duty, against Brown for tortious interference with contract, and against BBG for breach of contract. Brown and BBG answered and filed a counterclaim, seeking a declaratory judgment that the Redemption Agreement is void and unenforceable and seeking a return of the 9,000 shares of non-voting common stock donated by BBG and held by AFF, a permanent injunction against AFF's enforcement of the Redemption Agreement, and alleging estoppel and rescission.

Subsequently, AFF sought and was granted leave to amend its

complaint to add as defendants BBG directors Raymond Wilkins and Mike Cottingham on AFF's existing claim for breach of fiduciary duty and to add claims against all the defendants for allegedly wrongfully withholding dividends from AFF in breach of their common law fiduciary duty and their duty of good faith and fair dealing, and for oppressive or fraudulent conduct under Mississippi Code Annotated § 79-4-14.30.  The addition of these claims by AFF prompted counterclaims by Brown/BBG, and by Cottingham and Wilkins, for breach of the duty of good faith and fair dealing and for abuse of process.  Defendants have charged that AFF's claim based on an alleged entitlement to the payment of withheld dividends is directly contrary to the terms of the parties' agreement and in violation of AFF's duty of good faith and fair dealing.  They further assert that by naming Wilkins and Cottingham, who were not directors at the time of some of the acts alleged by AFF, and by asserting claims of statutory oppressive or fraudulent conduct, and by seeking the dissolution of BBG, AFF had engaged in abuse of process.

Early in this lawsuit, AFF moved for partial summary judgment on defendants' rescission defenses and on their counterclaim for rescission, and AFF separately moved pursuant to Federal Rule of Civil Procedure 12(b)(6) to dismiss defendants' counterclaims for breach of the duty of good faith and fair dealing and for abuse of process.  In addition, defendants moved early on for summary

judgment on their counterclaim for rescission.  On September 28, 2008, the court entered its opinion on those motions.  The court granted AFF's motion for summary judgment as to a few specific defenses raised by defendants, but it otherwise denied AFF's summary judgment motion, and it denied, as well, defendants' summary judgment motion.  The court also denied AFF's motion to dismiss defendants' breach of duty of good faith and fair dealing and abuse of process claims.  The parties have now filed second summary judgment motions on all these claims, counterclaims and defenses.  The court considers the motions/claims in turn.

CROSS-MOTIONS FOR SUMMARY JUDGMENT ON DEFENDANT'S RESCISSION CLAIM

Defendants have moved for summary judgment on their claim for rescission, arguing that "the entire SC2 transaction between Brown, BBG and AFF should be rescinded in its entirety as a matter of public policy" because "the IRS has disallowed the SC2 transaction as an 'abusive tax shelter transaction' and Congress has determined that it is a prohibited tax shelter transaction."  In a nutshell, defendants argue that in the SC2 transaction, AFF was not just an innocent beneficiary of charity, as it purports, but rather, as the IRS has found, was a knowing participant for hire, without whose participation the transaction could and would never have occurred.  Defendants submit that to allow AFF to benefit from an "abusive tax shelter transaction" which it facilitated, would offend public policy.

"Whether a contract clause is unenforceable on grounds of illegality or public policy is a question of law." <u>Cooper Tire & Rubber Co. v. Farese</u>, 423 F.3d 446, 456–458 (5th Cir. 2005) (citing <u>MacPhail v. Oceaneering Int'l, Inc.</u>, 302 F.3d 274, 278 (5th Cir. 2002), <u>cert. denied</u>, 537 U.S. 1110, 123 S. Ct. 891, 154 L. Ed. 2d 782 (2003)). It is well established as a matter of federal law that a court may refuse to enforce contracts that violate law or public policy. <u>See</u> <u>United Paperworkers Intern. Union, AFL–CIO v. Misco, Inc.</u>, 484 U.S. 29, 42, 108 S. Ct. 364, 373, 98 L. Ed. 2d 286 (1987).[1] However, the Supreme Court has cautioned that "since the term 'public policy' is vague, there must be found definite indications in the law of the sovereignty to justify invalidation of a contract as contrary to public policy." <u>Muschany v. United States</u>, 324 U.S. 49, 66, 65 S. Ct. 442, 451, 89 L. Ed. 744 (1945). Accordingly, a court's authority to refuse enforcement of parties' private agreements is limited to situations where the contract violates "some explicit public policy" that is "well defined and dominant, and is to be ascertained 'by reference to the laws and legal precedents and not from general considerations of supposed public interests.'" <u>W.R. Grace & Co v. Local Union 759, Int'l Union of the United Rubber, Cork, Linoleum & Plastic Workers of</u>

---

[1]    <u>Cf</u>. <u>Kelly v. Kosuga</u>, 358 U.S. 516, 519, 79 S. Ct. 429, 431, 3 L. Ed. 2d 475 (1959) (effect of illegality under a federal statute is a matter of federal law).

Am., 461 U.S. 757, 766, 103 S. Ct. 2177, 2183, 76 L. Ed. 2d 298 (1983) (quoting Muschany, 324 U.S. at 66, 65 S. Ct. at 451); see also Misco, 484 U.S. at 43, 108 S. Ct. at 373. "To put the question more specifically, does [the agreement sought to be avoided] ... run contrary to an explicit, well-defined, and dominant public policy, as ascertained by reference to positive law and not from general considerations of supposed public interests?" Muschany, 324 U.S. at 66, 65 S. Ct. at 451 (citing Misco, 484 U.S. at 43, 108 S. Ct. at 373). See also Eastern Associated Coal Corp. v. United Mine Workers of America, Dist. 17, 531 U.S. 57, 63, 121 S. Ct. 462, 467, 148 L. Ed. 2d 354 (2000) (stating that "the public policy exception is narrow and must satisfy [these] principles"); Fidelity & Deposit Co. of Maryland v. Conner, 973 F.2d 1236, 1241 (5th Cir. 1992) ("Although contractual agreements may be invalidated on grounds of public policy, public policy opens only a narrow exception within this general rule-an exception to be applied cautiously and only in plain cases involving dominant public interests."). Thus, from the foregoing, it is clear that unless the court can "find in the [laws], the regulations, or any other law or legal precedent an 'explicit,' 'well defined,' 'dominant' public policy to which the [subject agreement] 'runs contrary,'" Muschany, Brown's plea for rescission must be rejected.

In support of its motion for summary judgment on its claim for rescission based on public policy, Brown has pointed to statements by the IRS Commissioner to the Senate Subcommittee and the Senate Finance Committee relating to tax exempt organizations which were critical of "accommodation parties" such as AFF for their involvement in the SC2 transactions. In a November 2003 hearing on abusive tax shelters, the IRS Commissioner told the Senate Subcommittee,

> [A]busive transactions can and will continue to pose a threat to the integrity of our tax administration system. We cannot afford to tolerate those who willfully promote or participate in abusive transactions. The stakes are too high and the effects of an insufficient response are too corrosive.

An IRS News Release in June 2004 set forth additional comments by the Commissioner to the Senate Finance Committee relating to exempt organizations, quoting his comments as follows:

> I cannot overstate the seriousness of the involvement tax-exempt and government entities as accommodation parties to abusive transactions. We use the term accommodation party" to describe the tax-exempt entity's involvement in a transaction that does not necessarily affect the entity s primary function, but is designed to provide tax benefits to a third party that is a taxable entity. ...
> * * *
> When taxpayers use artificial means to avoid their share of the tax burden, they not only shift the burden to all taxpayers, but also undermine the public confidence in the integrity of our system. Further, for many tax-exempt entities most notably charities, tax-exemption, the charitable contribution deduction, and other tax benefits constitute an indirect subsidy of activities Congress has determined are beneficial to society. However, when those entities engage in transactions that offer tax benefits not intended by

13

Congress to third parties, there is a cost to society
without a corresponding increase in social benefits.

Defendants have further noted that in its Report on its
investigation into KPMG's tax strategies, the Senate Subcommittee
concluded:

> SC2 transactions could not have taken place at all
> without the willing participation of a charitable
> organization. To participate in the SC2 transactions, a
> charity had to undertake a number of nonroutine
> and potentially expensive, time consuming tasks. For
> example, the charity had to agree to accept an S
> corporation stock donation, which for many charities is,
> in itself, unusual; make sure it is exempt from
> unrelated business income tax (hereinafter "UBIT") and
> would not be taxed for any corporate income during the
> time when the charity was a shareholder; sign a
> redemption agreement; determine how to treat the stock
> donation on its financial statements; and then hold the
> stock for several years before receiving any cash
> donation for its efforts. Moreover relatively few
> charities are exempt from the UBIT, and those that are –
> like pension funds – do not normally receive large
> contributions from private donors.

While the cited statements reflect the IRS Commissioner's
criticism of organizations like AFF for their role in SC2 and
other tax shelter transactions, these statements are not "laws or
legal precedents" and thus do not provide a basis on which this
court may properly refuse enforcement of the parties' agreement.
However, in further support of their public policy argument,
defendants submit that in legislation enacted in 2006, Congress
explicitly condemned the role of accommodation parties like AFF in
these transactions and established a penalty tax against such
entities. In this regard, defendants point out that in 2006, in

response to the participation of AFF and other tax-exempt entities in the SC2 and other tax avoidance transactions, Congress enacted the Tax Increase Prevention and Reconciliation Act which, as described in IRS Notice 2006-65, "includes new excise taxes and disclosure rules that target certain potentially abusive tax shelter transactions to which a tax-exempt entity is a party." The Act includes a new section, 26 U.S.C. § 4965, under which the managers of covered tax-exempt entities, "and in some cases the entities themselves, can be subject to excise taxes if the entity is a party to a prohibited tax shelter transaction."  IRS Notice 2006-65.

Section 4965 defines "tax exempt entities" to include "non-plan entities" (which covers three subcategories of entities) and "plan entities" (which covers four subcategories of entities, including § 401 pension fund entities such as AFF.).  The statute provides for a tax directly on "non-plan entities" that participate in prohibited tax shelter transactions.  It does not provide for a tax directly on "plan entities," and hence it does not provide for a tax directly on AFF.  Rather, as to "plan entities" such as AFF, the statute states that the "entity manager" is subject to a tax if he "approves such entity as (or otherwise causes such entity to be) a party to a prohibited tax shelter transaction at any time during the taxable year and knows or has reason to know that the transaction is a prohibited tax

shelter transaction...."  § 4965(a)(2).  <u>See</u> § 4965(b)(2)

(providing for tax on manager of $20,000 for each approval or

other act causing entity's participation).

AFF reasons from the fact that Congress did not choose to

impose a tax or penalty on pension fund entities such as AFF

Congress has not declared the components of the transaction

entered into by AFF, Brown and BBG unenforceable as against public

policy.  That is, AFF focuses on the fact that even after Congress

passed § 4965 in 2006, no adverse tax consequences and provided

for tax-exempt municipal pension plans such as AFF from

participation in SC2-type transactions.  It concludes that "[i]f

Congress decided against taxing plans such as AFF for

participating in an SC2 transaction, and further failed to declare

such transactions void or unenforceable, under established federal

case law, courts should not impose a judicially-created penalty

such as voiding contractual obligations."  Defendants, conversely,

focus on the fact that § 4965 "clearly and unequivocally declares

the SC2 transaction a prohibited tax shelter transaction," and

they submit that while the statute may not provide for a penalty

tax on pension fund entities such as AFF directly, nevertheless,

"by penalizing entity managers for each approval or act causing

participation in a prohibited tax shelter transaction, Congress

clearly expressed public policy condemning the participation of

qualified pension plans such as AFF in SC2 transactions."

16

The court cannot find in § 4965 "an 'explicit,' 'well defined,' 'dominant' public policy" that would be violated by enforcement of the parties' agreement herein. The statute reflects Congress has chosen not to impose an excise tax on plan entities that participate in SC2 or other prohibited tax shelter transactions and thus Congress has chosen not to penalize any plan entity for such participation. And while the statute does provide for a penalty tax on entity managers who cause a plan entity to participate in prohibited transactions, that tax applies *only if the manager caused the entity to become involved with knowledge or reason to know that the transaction was a prohibited tax shelter transaction*. The fact that Congress chose to penalize entity managers only for their knowingly involving a plan entity in a prohibited tax shelter transaction suggests that public policy, as it applies to plan entities, condemns only knowing participation.

In the case at bar, both parties have taken the position that neither became involved in the subject SC2 transaction with knowledge or reason to know that it was a prohibited tax shelter transaction. On the contrary, both had been advised by KPMG that the transaction was proper, and they only learned otherwise when the IRS declared in 2004 that it was a prohibited transaction. Under the circumstances presented, the court concludes as a matter of law that the transaction is not subject to rescission on the basis that it violates public policy. Accordingly, the court will

17

deny defendants' motion for summary judgment on their rescission claim and defenses, and will grant AFF's cross-motion on this issue.[2][3]

## DEFENDANTS' MOTION FOR PARTIAL SUMMARY JUDGMENT ON SPECIFIC CLAIMS

AFF has alleged that defendants have attempted to squeeze out AFF as a shareholder by means of a scheme to deprive AFF of its rights under the BBG articles of incorporation as an equal shareholder, save and except for voting. This includes allegations that defendants fraudulently concealed from and deprived AFF of its rightful share of at least $2.6 million in dividends that BBG has paid from 2001 to 2004 to Brown during the time AFF has owned its BBG stock, and AFF's rights to other dividends that have been wrongfully withheld from 2001 to date, so as to wrongfully stockpile retained earnings and benefit Brown.

---

[2] In its amended complaint in this cause, AFF has alleged that defendants breached their fiduciary duty and duty of good faith by refusing to honor the Redemption Agreement and seeking rescission of the agreement. While the court has ultimately concluded that the parties' transaction cannot be undone on public policy grounds, the court is of the opinion that defendants presented a plausible argument for their position and did not violate their duty of good faith to AFF in making this claim.

[3] The court notes that in connection with the public policy issue, AFF had presented the report and testimony of one of its experts, Edith Moates, who offered her opinion, *inter alia*, that "because this transaction supported [the] public policy [of encouraging contributions to nonprofit organizations....], [then] it is not against public policy." Defendants have moved to strike Moates' testimony on this point on the basis that it is a legal conclusion to which she cannot properly testify. The court agrees, and has disregarded Moates' opinion in its evaluation of the parties' arguments on the substantive issue presented.

Put another way, AFF alleges that as the owner of the 9,000 shares donated by Brown, it fully expected to be paid its share of rightful dividends from profits of the company and that defendants withheld such dividends and concealed from AFF that dividends had been paid and that earnings were available for distribution and yet were stockpiled for Brown's benefits and to the detriment of AFF. Specifically, AFF alleges that

> by embarking upon and/or carrying out a scheme to plan
> to inequitably engineer the ruse of the $4.2 million
> note to pay Brown dividends in 2001-2003 while paying
> none to Austin and further to generally and improperly
> withhold dividends from Austin and to deprive it of the
> value of its non-voting stock, BBG, Brown, Wilkins and
> Cottingham committed and conspired to commit, fraud,
> oppression and breach of fiduciary duty at common law
> and such individual defendants breached their duty of
> good faith under Miss. Code. 79-4-8.3 and 79-4-8.42.

In their motion for summary judgment, defendants point out that each of these claims by AFF is based on the premise that AFF, as a BBG shareholder, was entitled to receive dividends, and yet according to defendants, the evidence demonstrates beyond dispute that AFF agreed and objectively acknowledged when it entered into the SC2 transaction that BBG was not required to pay dividends to AFF during the time that AFF held the BBG non-voting stock.

Previously, in ruling on motions for summary judgment, the court wrote,

> Certain realities of the parties' transaction are
> apparent from the evidence of record, including the fact
> that the parties' arrangement contemplated that no
> dividends would be paid by BBG to AFF while AFF held the
> subject stock. All the evidence of record thus far

19

demonstrates beyond reasonable challenge that AFF
understood and knew that Brown/BBG's purpose in entering
the transaction was to obtain favorable tax treatment in
the form both of a charitable contribution deduction and
directing income away from BBG and to the tax-exempt
AFF; that AFF knew and understood that the value of
Brown/BBG's putative "gift" or donation of the subject
stock was in AFF's right to redeem the stock; and AFF
knew that the transaction was intentionally structured
so that it would not receive dividends on the stock
during the time it held the stock, other than as might
be paid by Brown/BBG for the purpose of extending the
time during which AFF would agree to hold the stock
prior to redemption.  By all indications, AFF expected
to realize the value of the gift of stock by redemption
of the stock, not by the receipt of dividends.  In the
Executive Summary provided by KPMG to AFF describing
proposed SC2 transactions, KPMG explained that "income
will not actually be distributed to the holder."  In
executing the Acknowledgment of Receipt, AFF explicitly
acknowledged that BBG was not required to make
distributions of income to shareholders for any purpose,
and absent specific action by BBG's Board of Directors,
BBG would not be required to make distributions in the
foreseeable future.  And the Redemption Agreement
recites that the price at which BBG would repurchase the
shares from AFF was the fair market value on the date
presented for redemption, which value was to be
determined taking into account, among other things,
"that the Corporation is not obligated to pay
dividends."  The transfer of the stock was not intended
to and did not include a transfer of the right to
receive dividends; in purpose and effect, the "gift" was
of the right to redeem, and to do so at a price which
the parties expressly agreed and acknowledged would take
into account the fact that BBG was not obligated to pay
dividends on the stock.  Thus, based on the evidence
adduced to date, defendants would seem to be correct,
that AFF's claim for the recovery of dividend payments
is unsupported by the facts and law, as being directly
contrary to the parties' intent and understanding of
their arrangement.

2008 WL 4450253, at 13.  In support of its present motion, Brown

has relied on many of the same documents on which it previously

relied, and which are referenced in the court's earlier opinion,

from which Brown has quoted extensively. Brown has also

referenced additional testimony from AFF administrator William

Stefka regarding AFF's expectations with regard to receipt of

distribution of income. Brown notes, for example, that Stefka

testified before the Senate Subcommittee, which reported that AFF

told the Subcommittee that in every SC2 transaction,

> it was their expectation that they would not retain
> ownership of the donated stock, but would sell it back
> to the stock donor after the expiration of the period of
> time indicated in the redemption agreement. *They also
> indicated that they did not expect to obtain any
> significant amounts of money from the S corporation
> during the period in which the charity was a stockholder
> but expected, instead, to obtain a large cash payment at
> the time the charity sold the stock back to the donor*.

Brown also points out that AFF was given a copy of BBG's by-laws,

including Article XII, Dividends, which recites that "[t]he Board

of Directors has the sole power to declare and set the terms and

conditions for dividends and, absent unanimous approval of the

Board of Directors *the corporation shall not be obligated to pay

dividends under any circumstances to pay any dividends or to

distribute cash to shareholders to pay income taxes due on account

of their stock ownership in the corporation*." (Emphasis added).

Brown further notes that Randy Aylieff, Vice-Chairman of the AFF

Board, testified it was his understanding that while BBG's board

was not precluded from paying a dividend if they decided to, they

were not obligated to do so. Ayleiff stated, *inter alia*,

> I think that there was no agreement that the board of
> directors (BBG) was obligated or predetermined to give

us any dividends that they didn't – they may later come
in there and decide to give dividends and were free as
fiduciaries of that corporation to give dividends at any
time they determined they should be granted.  We just
didn't have an agreement up front that said you will pay
us dividends.  I mean, there was nothing there, –– you
know, like I said there was nothing precluding them from
acting as directors of the board and doing what
directors do.

Finally, Brown notes that AFF had been involved in three other SC2

transactions prior to the transaction with BBG, in each of which

AFF had signed acknowledgments and agreements with identical

language to the Acknowledgment and Redemption Agreement in the BBG

SC2.  Brown argues that in light of all the evidence, it cannot be

disputed "from an objective standpoint that AFF knew it was not

entitled to receive dividends during the time it held BBG's

non-voting common stock.  Objectively viewed, AFF did not have any

expectations to receive dividends...."  Brown thus contends that

it is entitled to summary judgment on AFF's claims for fraud,

breach of fiduciary and good faith duties, and shareholder

oppression, all of which are ultimately premised on AFF's claimed

right to receive dividends.

In response to defendants' motion, AFF insists that although

BBG's bylaws recited that BBG was "not obligated to pay

dividends," and the Redemption Agreement provided that BBG was

"not obligated to pay dividends," and the Acknowledgment signed by

AFF acknowledged that BBG was not "obligated to pay dividends,"

AFF never agreed or acknowledged when it received the BBG stock or

22

executed the Redemption Agreement that BBG, through its directors, would not owe fiduciary duties and duties of good faith to AFF in considering and paying dividends to AFF while AFF held its stock. That is, as explained by AFF's Randy Aylieff and William Stefka, who testified by deposition and affidavit, respectively, just as would any other shareholder, AFF expected to be treated fairly by the directors in exercising their fiduciary duty for consideration of and payment of dividends. Significantly, AFF has also presented evidence of a legal analysis of the proposed transaction prepared by KPMG, which legal analysis was requested from KPMG by Brown's and BBG's attorneys prior to the transaction as part of their evaluation of the transaction. This KPMG legal memo, which was provided to Brown's counsel, is consistent with and supportive of AFF's position herein. In that memo, KPMG explained that participating entities such as AFF would have equal rights to dividends; that the business judgment rule of discretion to declare dividends would apply, and this rule required that directors' discretion to declare dividends would be "fairly exercised"; and that entities such as AFF would have the legal right to sue if they took the position that the directors' discretion was not "fairly exercised." Specifically, the KPMG legal memo, of which Brown and BBG, through their counsel, apparently were aware upon entering the transaction, recited, "Exempt-Org is an independent party not under the control of

Shareholder and is able to fully exercise all of its rights as a shareholder. ... Exempt-Org has not waived any of its rights as a shareholder." Further while the memo recited with respect to dividends that "it should not be relevant whether distributions were actually made because Exempt-Org knew when it accepted the stock that it did not have the power to force a distribution," it goes on to state,

> The right of a stockholder to the declaration of a dividend rests in the discretion of the directors, *so long as such discretion is fairly exercised*. The decision, whether or not to make a distribution, is one of business judgment, not law. The courts will not interfere in the legitimate business decisions of a private corporation just to resolve a dispute between majority and minority shareholders. Stockholders have no individual or property interest in the profits of a corporation and are not entitled to any portion of the accumulated earnings until declaration of a dividend or its equivalent.
>
> *If a shareholder believes that the corporation is improperly withholding legitimate distributions, it has the right to file suit and compel the corporation to make a distribution.... Exempt-Org., in the proposed transaction, has this right.*

As the court's earlier opinion recognized, there is abundant evidence indicating that upon entering the subject transaction, AFF understood and accepted that it would not receive dividends, and which suggests that it in fact had no intention or legitimate expectation of receiving any dividends from BBG, even if in other circumstances they might have been properly payable. However, in light of the evidence presented and argued by AFF on the present motion, the court must conclude that AFF has created a genuine

24

issue of material fact for trial as to whether or not AFF, upon entering the transaction, in fact (and in law) purportedly and effectively relinquished any right it might otherwise have had to receive dividends, if such were otherwise properly payable. Accordingly, to the extent defendants' motion for summary judgment is based on their position that AFF objectively had no expectation of receiving or entitlement to receive any dividends as part of the transaction, then their motion must be denied.[4]

Defendants have also argued that under no circumstances can Wilkins and Cottingham be liable with respect to any of AFF's claims for dividends because neither was a director in December 2000 when the $4.2 million dividend was declared paid to Brown. They further argue that AFF has no cognizable claim with respect to that $4.2 million dividend because BBG declared and authorized the $4.2 million dividend prior to AFF's becoming a shareholder. The court will deny the motion for the reasons set forth by AFF in

---

[4] The court finds it unnecessary to at this time address AFF's further legal arguments relating to shareholder rights and the unenforceability of exculpatory clauses, particularly vague or unspecific exculpatory clauses.

its response to defendants' motion, as to which defendants have made no reply.[5] [6]

AFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT

Defendants have filed counterclaims against AFF for breach of the duty of good faith and fair dealing, alleging that by filing this lawsuit and "attempting to obtain funds from Brown and BBG" on the basis of claims and allegations that are "contrary to the documents that it executed as part of the SC2 transaction with Brown and BBG," AFF has breached its duty of breach of good faith and fair dealing.  Similarly, they have charged AFF with abuse of process, alleging,

> By asserting claims against Brown, BBG, Wilkins and
> Cottingham, directly contrary to documents executed by
> AFF, and, further, by naming Wilkins and Cottingham, who
> were not directors at the time of some of the acts
> alleged by AFF, and, further, by asserting claims of
> Statutory Oppressive or Fraudulent Conduct by BBG,
> Brown, Wilkins, and Cottingham, and Dissolution, AFF has

---

[5]     Indeed, the court notes that although defendants filed what  purports to be a reply to AFF's response, the reply is devoid of substance.  Therein, defendants do not address any of the evidence or myriad legal arguments advanced by AFF in its response; rather, they merely declare that the court should grant summary judgment in their favor.

[6]     Though it filed a response to defendants' motion for summary judgment, AFF also filed a Rule 56(f) motion for continuance, arguing that this court's adverse rulings on certain discovery matters, which rulings are the subject of pending challenge/objection by AFF (addressed *infra*), have severely hampered AFF's ability to fully respond to defendants' summary judgment motion.  Although the court does conclude *infra* that AFF is entitled to further discovery, the court nevertheless will deny the Rule 56(f) motion to continue, since the court concludes that the motion for summary judgment must be denied based on the evidence already in the record.

asserted claims meeting the following criteria: (1) an illegal use of a legal process; (2) has an ulterior motive; and (3) Brown and BBG have been damaged by the perverted use of process.

AFF has moved for summary judgment on both of these claims.

As AFF notes, under Mississippi law, every contract carries with it an implied covenant of good faith and fair dealing in their performance, which covenant holds that "neither party will do anything which injures the right of the other to receive the benefits of the agreement." Ferrara v. Walters, 919 So. 2d 876, 883 (Miss. 2005). The duty of good faith and fair dealing "arises from the existence of a contract between parties." American Bankers' Ins. Co. of Fla. v. Wells, 819 So. 2d 1196 (Miss. 2001) (citing Cenac v. Murray, 609 So. 2d 1257, 1272 (1992)). Thus, it is said that "[g]enerally, as a matter of law, when a party acts in accordance with the express terms of a contract, the implied covenants of good faith and fair dealing have not been violated." Wilson v. Ameriquest Mortg. Co., Civil Action No. 5:05cv122-DCB-JMR, 2006 WL 2594522, 5 (S.D. Miss. Sept. 8, 2006) (citing Baldwin v. Laurel Ford Lincoln-Mercuy, Inc., 32 F. Supp. 2d 894, 898 (S.D. Miss. 1998)). Here, AFF points out that there may be evidence of various documents – opinions, summaries, acknowledgments, etc. – on which the parties have relied to demonstrate their respective understanding and/or expectations regarding the broader SC2 transaction or arrangement, yet there was, in fact, only one contract between the parties, which was the

Redemption Agreement.  And AFF maintains that since the evidence bears out its position that it has taken no action, whether in bringing this lawsuit or otherwise, that was not fully consistent with the terms of that Redemption Agreement, then it follows as a matter of law that defendants have no viable claim against it for breach of the duty of good faith and fair dealing.  The court agrees and thus, will grant AFF's motion for summary judgment on this claim.

The essence of defendants' abuse of process claim, as the court understands it, is that by filing and continuing to prosecute a non-meritorious lawsuit against them, for the purpose of forcing a settlement to which it knows it is not entitled, AFF has engaged in an abuse of process.  The elements of a claim for abuse of process under Mississippi law are as follows: "(1) the party made an illegal use of a legal process, (2) the party had an ulterior motive, and (3) damage resulted from the perverted use of process."  Ayles v. Allen, 907 So. 2d 300, 303 (Miss. 2005).  In support of its motion for summary judgment, AFF relies on Moon v. Condore Corp., 690 So. 2d 1191, 1197 (Miss. 1997), and Edmonds v. Delta Democrat Publishing Co., 93 So. 2d 171, 174-175 (Miss. 1957), in which cases the Mississippi Supreme Court held that where an abuse of process claim is based simply on the filing of a lawsuit, it cannot be said that process of the court has been abused by accomplishing a result not commanded by it or not

lawfully obtainable under it.  See Edmonds, 93 So. 2d at 175 ("It cannot be argued that the process of the court was abused by accomplishing a result not commanded by it or not lawfully obtainable under it when the only process involved was a simple summons to defend the suit."); Moon, 690 So. 2d at 1197 (no cause of action for abuse of process where "the only process involved ... was the summons" and "there was no improper use of process after it had been issued"); see also U.S. Axminster, Inc. v. Chamberlain, Civil Action No. 4:95cv332–D–B, 1997 WL 786772, 6 (N.D. Miss. Oct. 2, 1997) ("An action for abuse of process 'is concerned with the improper use of process after it has been issued,'" so that mere filing of lawsuit was not an abuse of process).

AFF submits that as defendants have identified no illegal or improper use of process, but rather have merely alleged that AFF has filed a lawsuit which defendants believe and contend has no merit, they have no cognizable claim for abuse of process under the holdings of Edmonds and Moon.  It further argues that defendants cannot satisfy the second element of their claim, for even if they had *alleged* an ulterior motive for the lawsuit, which AFF denies, they have come forward with no evidence to establish what could legitimately be characterized as an ulterior motive. AFF contends that while defendants have presented evidence to show that they disagree with the factual and legal basis for AFF's

claims, this evidence says nothing about AFF's motives for bringing the action.  Indeed, it does appear that under the reasoning of Moon and Edmonds, and in further view of the absence of evidence (as contrasted with speculation) of an ulterior motive, defendants' position cannot be sustained and accordingly, AFF's motion on this claim must be granted.

AFF'S MOTION FOR RECONSIDERATION

AFF has moved for reconsideration of this court's June 26 2009 order denying AFF's objections to the magistrate judge's March 10, 2009 orders denying AFF's motions to compel and for production.  AFF requests that the court reconsider its order denying AFF's objections to the magistrate judge's orders to correct clear error and prevent manifest injustice, arguing that the magistrate judge's rulings were based on an erroneous premise derived from this court's September 29, 2008 memorandum and opinion and order denying summary judgment.  More specifically, statements in the court's earlier opinion that "the transfer of stock (from BBG to AFF) was not intended to and did not include a transfer of the right to receive dividends," and that "BBG was not obligated to pay dividends on the stock," led the magistrate judge to conclude that evidence relating to dividends paid or not paid, or to income or earnings available for distribution by BBG, was not relevant, and to therefore deny AFF's discovery requests aimed at obtaining such evidence.  As the court has now concluded in the

context of its consideration of and ruling on Brown's second motion for summary judgment that there are disputed issues of fact regarding AFF's expectations with respect to the payment of dividends for the BBG stock, as a result of which conclusion it cannot at this time be said as a matter of law that AFF has no viable claim based on dividends allegedly wrongfully withheld, it follows that AFF is entitled to discovery pertinent to the dividend issue.[7] Accordingly, to the extent the magistrate judge denied AFF's requests for discovery relating to this issue, i.e., to the extent he denied AFF access to BBG financial information post-December 31, 2004 in reliance on the court's prior summary judgment opinion and order, his order must be vacated, as must the undersigned's order denying AFF's application for review. And, inasmuch as the court concludes that AFF is entitled to discovery on the dividend issue, discovery will be reopened as to this issues, and the parties are hereby directed to contact the magistrate judge's office for a status conference to address the parameters of such discovery.

---

[7]    In a related vein, AFF has argued that reconsideration is in order based on new evidence, in particular work papers of David Black, which it submits "leads to the reasonable probability that BBG and the other defendants since early 2005 had planned to, and in fact did in 2006, cause BBG to directly or indirectly pay the millions of dollars in back taxes, interest and penalty for Brown by a distribution or a loan, in which all Defendants participated and which all Defendants approved." AFF argues that defendants have been able to "mask such a multimillion dollar raid on the BBG treasury by the Magistrate Judge's denial of BBG financial information after December 21, 2004 and by the subject Order Denying Objections."

<u>AFF'S MOTION FOR REVIEW OF MAGISTRATE' JUDGE'S ORDER [DOC 224]</u>

AFF's objection to the magistrate judge's order (Doc. 224) challenges certain rulings based on attorney-client privilege, as to which rulings the court finds the motion for review to have no merit, and challenges other rulings based on a lack of relevance relating to post-December 31, 2004 matters, which rulings relied on the court's earlier ruling, addressed *supra*, that as a matter of law, AFF could not make out a case that dividends were wrongfully withheld. To the extent the challenged order is based on a perceived lack of relevance of evidence relating to dividends, which perception derived from the court's prior opinion, it is vacated in light of the court's conclusion that AFF is entitled to discovery relating to the issue of dividends.

<u>MOTIONS TO EXCLUDE EXPERT TESTIMONY</u>

AFF has moved to exclude the testimony of defendants' expert David L. Black, contending that Black's opinions do not meet the threshold requirements for admissibility under <u>Daubert v. Merrell Dow Pharmaceuticals, Inc.</u>, 509 U.S. 579, 113 S. Ct. 2786, 2796-98, 125 L. Ed.2d 469 (1993), because his opinions are not based upon sufficient facts or data, his opinions are not the product of reliable principles and methods, and he has not applied the principles and methods reliably to the facts of the case. The court has considered the motion and response thereto, and finds

that while Black's proffered opinions may be open to challenge, they satisfy <u>Daubert</u>.  <u>See</u> <u>Huss v. Gayden</u>, 571 F.3d 442, 452 (5th Cir. 2009) (quoting <u>Daubert</u>, 509 U.S. at 596, 113 S. Ct. 2786 holding that "[v]igorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence," along with reasoning in <u>Holbrook v. Lykes Bros. S.S. Co., Inc.</u>, 80 F.3d 777, 782 (3d Cir. 1996) that "most arguments about an expert's qualifications relate more to the weight to be given the expert's testimony than to its admissibility").

Defendants have moved to exclude the June 15, 2009 affidavit and supplemental report of AFF's expert James M. (Mike) Hill because, according to defendants, the information upon which Hill relied in preparing the report was available to him prior to the time of his initial Rule 26 expert report and yet the opinions set forth in the supplemental report were not set forth in Hill's initial report.  Having reviewed the parties' submission and arguments, the court is unpersuaded that Hill's supplemental report amounts to improper supplementation, and therefore, the court will deny the motion to exclude.

<u>CONCLUSION</u>

Based on the foregoing, it is ordered as follows:

- Defendants/counterplaintiffs' second motion for summary judgment for rescission, or in the alternative, motion for partial summary judgment on specific claims in the first amended complaint [Docs. 157 & 175] are denied;

- AFF's Rule 56(f) motion for continuance [Doc. 200] is denied;

- AFF's second motion for partial summary judgment [Doc. 164] is granted;

- Defendants' motion to exclude certain expert testimony of Edith F. Moates [Doc 159] is granted;

- AFF's motion for reconsideration of the court's June 26th, 2009 order relating to AFF's objections to the magistrate judge's March 10, 2009 orders [Doc. 213] is granted as set forth herein;

- AFF's motion for review of magistrate judge's order [Doc. 232] is granted in part and denied in part, as set forth herein;

- Defendants' motion to exclude the affidavit of James M. "Mike" Hill and Exhibit "A" attached thereto [Doc. 196] is denied; and

- AFF's motion to exclude expert testimony of David L. Black [Doc. 162] is denied.

SO ORDERED this 11th day of February, 2010.

/s/Tom S. Lee
UNITED STATES DISTRICT JUDGE